[No. 29527. Department Two. August 9, 1945.]

THE DEPARTMENT OF PUBLIC SERVICE, *on the Relation of Anacortes Chamber of Commerce et al., Appellants,* v. L. A. SHELTON, *Respondent.*[1]

[1]Reported in 161 P. (2d) 309.

*Welts & Welts* and *Ben Driftmier*, for appellants.

*The Attorney General* and *R. Paul Tjossem, Assistant,* for respondent Department of Public Service.

*Clarence J. Coleman* and *Thomas G. McCrea,* for respondent L. A. Shelton.

ROBINSON, J.—The title under which this cause was docketed is confusing. The Anacortes Chamber of Commerce and Anacortes-Mount Vernon Stage Company, a corporation, hereinafter referred to, for the sake of brevity, as Affleck line, are the appellants here, and the state department of public service, hereinafter referred to as the department, and L. A. Shelton, doing business as Mukilteo-Whidby Stages, hereinafter referred to as Shelton, are the respondents.

In addition to voluminous pleadings, there is a transcript of more than six hundred pages of oral testimony, supplemented by a variety of documentary exhibits, all of which it has been necessary to examine in order to get the background of the matter. We cannot attempt to state the evidence in this opinion, except in general terms; nor do we think a detailed statement is required, since there is but little dispute as to the facts. The principal questions raised by the appeal relate to the legal conclusions predicated thereon.

For some years prior to the beginning of the controversy, Shelton operated as a carrier of passengers for hire under a statutory certificate of convenience and necessity. This proceeding is concerned with that part of its operation between Anacortes, in Skagit county, Washington, and Oak Harbor, in Island county. The Affleck line was similarly authorized to operate stages between Anacortes and Mount Vernon. The roads from Oak Harbor to Anacortes and from Mount Vernon to Anacortes unite at a point easterly from Anacortes, so that for a little distance the two lines cover the same route.

Several years ago a naval air base was established at Oak Harbor. For security reasons, the number of men stationed there is not shown in the record. It is shown, however, that the base was of such size as to result in a sudden and very great increase of passengers by bus between Oak Harbor and Anacortes and Oak Harbor and Mount Vernon, consisting of servicemen on leave or whose families were located in one of these cities, and also many civilian employees who, for lack of living quarters at the base, were compelled to live elsewhere and commute to Oak Harbor.

Shortly after the sudden increase of travel between Oak Harbor and Anacortes, complaints were filed against Shelton's service as being unsatisfactory and inadequate. Many of these complaints were informally made by servicemen and workmen, singly or in groups. Ultimately, complaint was made by the proper authorities at the air base. Several formal complaints were made by the Anacortes Chamber of Commerce. Five or six hearings were held. It is with the last two that we are now directly concerned.

Prior to the first of these two hearings, which was held on August 4, 1943, the department had, as a result of previous hearings, permitted the Affleck line to render a temporary emergency service between Anacortes and Oak Harbor. As the result of the hearing on August 4th, the department made the following order on October 11th:

"WHEREFORE, It Is ORDERED that respondent institute and maintain six (6) round trips per day, between Anacortes

and Oak Harbor; that respondent base at least two busses at Anacortes; that respondent acquire terminals or waiting rooms at Anacortes and Oak Harbor; that respondent make up a schedule of trips for service between Oak Harbor and Anacortes, and submit same to the department for approval within five (5) days after date of this order; that the Anacortes-Mt. Vernon Stage Company be permitted to continue its emergency service between Oak Harbor and Anacortes until respondent complies fully with the provisions of this order.

"This order shall be effective ten (10) days after date."

On December 6, 1943, the department canceled the temporary permit for emergency service previously granted to the Affleck line, and since that date Shelton has been the sole operator on the route.

On January 26, 1944, the Anacortes Chamber of Commerce filed another complaint and petition praying for the immediate restoration of the emergency service formerly given by the Affleck line, and that further hearings be held looking to an absolute cancellation of Shelton's certificate. On January 28th, the Affleck line filed a complaint and petitioned the department to restore its emergency service. These petitions came on for hearing on March 16, 1944, and a further hearing on April 4th. On June 26th, the department entered the following order:

"WHEREFORE, IT IS ORDERED that the complaints and petitions of the Anacortes Chamber of Commerce filed on January 26, 1944, and of the Anacortes-Mt. Vernon Stage Company filed January 28, 1944, be and they are hereby dismissed and denied."

The Anacortes Chamber of Commerce and the Affleck line procured a writ of review from the superior court of Thurston county, and, upon the return thereof, that court sustained the department's order by entering the judgment and decree from which this appeal was taken.

The department points out in its brief that the appellants have made no assignment of errors, as required by the rules governing appeals, but makes no motion regarding the matter, conceding its ability to spell out the errors claimed by the appellants from their somewhat argumenta-

tive statement of the questions involved. Under the caption "Statement of Questions Involved," the appellants say:

"First: In hearing upon complaint to Department of Public Service, is testimony relative to conditions subsequent to the filing of the complaint determinative of the controversy?

"The answer of the trial court was in the affirmative."

■ From the argument made in the briefs, and orally before the court, and more particularly from the text of a petition which we find in the record for a reopening of the matter after the department order came down, we understand that the appellants' claim is that the department erroneously gave decisive weight to evidence introduced as to the character of service rendered by Shelton subsequent to the filing of the complaints late in January, 1944, and right up to the date of the second hearing on the following April 4th. In fact, it seems to be contended that such evidence was not even relevant. We think there is no merit in this claim, for several reasons:

*First:* It clearly appears that the appellants directly invited the evidence complained of. We quote, from volume 2 of the transcript of evidence, several questions which the appellants' examining attorney put to their first witness, the president of the Anacortes Chamber of Commerce, in opening the hearing on March 16th:

"Q. What is the attitude of the members of the Anacortes Chamber of Commerce regarding the services that they are receiving since December 6, 1943, on the Anacortes-Oak Harbor stages?" (p. 8)

"Q. Are the members of the Anacortes Chamber of Commerce satisfied with the service that is being rendered?" (p. 9)

"Q. Mr. Todd, since October 11th to the present date has the Chamber of Commerce at various times taken action officially in its meetings complaining about the service of the Anacortes-Oak Harbor stage service?" (pp. 9-10)

"Q. Can you state upon what reasons or for what reasons those actions were taken?" (p. 10)

To the last question the witness answered: "Because they considered the service inadequate at the present time."

*Second:* The evidence complained of was invited by the complaints and petitions pursuant to which the hearings were held. We quote paragraph 4 of the petition of the Chamber of Commerce:

"That a temporary permit to the Anacortes-Mt. Vernon Stage Co., between Anacortes and Oak Harbor, is an immediate urgent necessity, in order to provide proper transportation facilities pending further proceedings herein. That hearing be held in this cause upon this complaint and petition and that the Department cause dependable service to be installed and maintained by some carrier adequate to solve the transportation needs between Anacortes and Oak Harbor and Whidby Island. *That testimony be taken both with respect to whether the respondent has complied with the order of October 11th, 1943, and with respect to the present transportation needs between Anacortes and Oak Harbor.*" (Italics ours.)

*Third:* The relief prayed for not only made the introduction of evidence as to the character of service being rendered right up to the date of hearing relevant, but, in fact, such evidence was absolutely indispensable if the granting of that relief was to be seriously considered. The prayer of the Chamber's petition was as follows:

"WHEREFORE your petitioner prays that the Department forthwith restore emergency service between Anacortes and Oak Harbor authorizing the Anacortes Mount Vernon Stage Co. to operate such emergency service pending further proceedings herein *and that in this case further hearing be had and testimony taken specifically with respect to the present transportation needs between the two points* and with respect to whether respondent has or has not complied with the order of October 11, 1943, *and that at the conclusion of said hearing the certificate of respondent be cancelled and terminated* and that the Department take steps necessary to the granting of a certificate to a competent carrier to the end that adequate and sufficient service of a reliable and dependable nature be provided between Anacortes and Oak Harbor and Whidby Island points and that the Department use its power and authority to see that such proper service be thereafter maintained." (Italics ours.)

It was provided by § 4, chapter 111, Laws of 1921, p. 341, that auto transportation of persons or property should not be carried on over regular routes in this state without the carriers having obtained a certificate of public convenience and necessity. This act has been amended in many particulars, but it appears that the following provisions thereof, regulating the powers of the then public service commission as to applications for a certificate to operate in territory already served or to cancel the certificate formerly issued, are still in effect and define the powers of the present department of public service as to such matters, at least when, as here, the carriage of passengers is involved. We quote from § 4, chapter 111, Laws of 1921, p. 341:

"The Commission [later denominated Department of Public Service] shall have power, after hearing, when the applicant requests a certificate to operate in a territory already served by a certificate holder under this act, only when the existing auto transportation company or companies serving such territory will not provide the same to the satisfaction of the Commission, . . ." Rem. Rev. Stat. (Sup.), Vol. 7A, § 6390 [P.P.C. § 282-7].

And from § 3 of the same act, p. 340:

"The Commission may, at any time, by its order duly entered after a hearing had upon notice to the holder of any certificate hereunder, and an opportunity to such holder to be heard, at which it shall be proven that such holder *willfully* violates or refuses to observe any of its proper orders, rules or regulations, suspend, revoke, alter or amend any certificate issued under the provisions of this section, . . ." Rem. Rev. Stat. (Sup.), Vol. 7A, § 6389 [P.P.C. § 282-5]. (Italics ours.)

In this proceeding, the Affleck line petitioned for authority to serve a territory already being served by Shelton, a certificate holder, and petitioner, Chamber of Commerce, not only supported that petition, but further prayed that the outstanding certificate covering that territory be wholly canceled. It is our opinion that an order granting either of these requests would necessarily speak as of the day of its issuance. An order granting the petition of the Affleck line would have to be founded upon a finding that Shelton

"will not provide service" to the satisfaction of the department, and an order canceling the Shelton certificate, as prayed for by petitioner, Chamber of Commerce, would have to be based upon a finding that, as of the date of the order, Shelton "willfully violates or refuses" to observe any of the department's orders, rules, or regulations.

The second question raised by appellants is stated as follows:

"Second: Did the Department proceed upon a fundamentally wrong basis where flagrant, numerous and continued violations of its orders was shown within the period alleged, in holding that complaints therefor should .be dismissed because respondent promised improved service and produced vague evidence that it had been improved subsequent to the filing of the complaint, complainants having submitted no evidence dealing with this subsequent period?

"The answer of the trial court was in the negative."

The real question involved here is somewhat obscured by an argumentative method of statement. As the briefs and oral arguments, considered together, show, the appellants proceeded upon a theory that, if they demonstrated the order of October 11th had not been carried out promptly, it became the absolute duty of the department to cancel the Shelton certificate. The department proceeded upon the theory that, in order to lawfully cancel the certificate, it must at least find that Shelton's failure to comply with the order was willful, and that such failure was likely to be continued and repeated. We have indicated in our answer to the first question that we think the department's theory was correct. As to whether or not the respondent's evidence of improvement was "vague," as asserted in the second question, will be briefly dealt with in dealing with the third question, which appellants state as follows:

"Third: Where the evidence shows that the equipment was dangerous; that terminal facilities as ordered were not furnished; where two hundred fifteen out of two hundred fifty-two trips were late; at least ten trips left ahead of schedule and twenty-two trips missed entirely, should not

the Department find the violations to have been willful and dealt with accordingly?

"The answer of the trial court was in the negative."

The evidence to the effect that "the equipment was dangerous" was sharply controverted. The department, in an elaborate review of the evidence, labelled "Findings of Fact," says, in part:

"Three bus drivers in the employ of the Shelton line testified that in their operation of the Shelton buses they had experienced no brake trouble; that they knew some drivers had had trouble with the brakes on the equipment, but it was their opinion that the trouble was due to inexperienced drivers who either drove too fast putting unnecessary strain on the brakes on hills, or who failed to realize buses were extremely heavy vehicles and that the strain on brakes should be alleviated in going down hill by the use of compression of the motor through putting the car in low gear. They testified that from their experience the buses always had proper braking power when the runs were started, but that a bus could lose its brakes through improper use during the run. They further testified that they had not experienced any gas fumes in the buses; that the door in one of the buses which it had been alleged could not be closed from the driver's seat could be operated from the driver's seat if the driver knew how; that the bus which it had been alleged 'shimmied' never acted in that manner when they were driving it."

The department fairly summarized the evidence given by one of the three witnesses mentioned, as follows:

"The third driver who has had a great deal of experience in driving buses for one of the large interstate bus lines stated that he had had no trouble with the equipment; that the brake trouble experienced by some drivers was due to their own inexperience; that he had had no fumes in the buses; that the lighting system was in good order; that the passengers had always been safe; that the equipment of the Shelton line, while naturally not up to the standard of a large interstate bus company, was good for a small independent line."

Relative to the matter of poor equipment, the department further says in its findings:

"Relative to the poor service of the line in December,

it appears that there were a great many motor difficulties in December. Unexplainable things happened to the equipment which never happened before in 24 years' bus operation. It was found that the carburetors in the buses had water in them in the morning. Several of the radiators were clogged up and had to be cleaned and boiled out. Because of the clogged radiators motors burned out. The heads of motors cracked and numerous head gaskets blew out. This undoubtedly explains the gas fumes complained of. On the 9A, one of the buses, the motor was rebored. Twenty-eight days later the bearings on this motor burned out. These were fixed and two weeks later the bearings again burned out. Upon the motor being dismantled it was found that a pound of sand was in the crankcase. Mrs. Shelton thereupon called upon the Federal Bureau of Investigation. With reference to water in the carburetors, this occurred whether the weather was cold or warm, and the source of the gasoline purchased was analyzed and it was found that no water was contained at the source. All of these motor troubles occurred during December and the first part of January. At one time three motors were out of use at one time due to such causes. The motor trouble started following the issuance of the department's order. Such a siege of motor trouble had never been experienced previously in all the period the bus line was operated since 1918. The buses had been left over night out in the open, but Mrs. Shelton thereafter acquired a garage."

As to failure to establish terminal facilities, as ordered, there is testimony that terminals were established in obedience to the order of October 11th, both at Oak Harbor and at Anacortes, but, at the Anacortes end of the line, there was no fixed terminal for a portion of the month of December and even later, because the premises were sold, the line had to vacate them, and another terminal could not be immediately secured.

The statement made in the third question as to Shelton's departure from schedules is the result of a check made at Oak Harbor by a man detailed by the Navy, covering the period from December 7, 1943, to January 3, 1944, combined with the results of a check made at Anacortes by a man employed by the Affleck line, covering the period from December 6 to December 29, 1943. As Shelton kept

no written record of its arrivals and departures, it was not in its power to directly controvert this evidence. It called attention to the fact that at least 107 of the 215 late trips were late for but five to ten minutes. It asserted it to be within the knowledge of the department, and even common knowledge, that the best equipped bus companies operating on the old established lines have been unable to maintain their schedules at all times since the outbreak of the war. It further stressed the fact that it was compelled to adjust itself to a great and sudden increase of traffic. Some idea of the rapidity and magnitude of this increase may be inferred from the following finding of the department:

"It appears that the business of the Shelton line has increased tremendously. From July 19 to August 1 of last year (1943) a period of 15 days, there were a total of 749 passengers carried between Anacortes and Oak Harbor. These figures include those passengers carried by the Affleck line which was then operated, as well as those of the Shelton line. This year, however, when the service is exclusively rendered by the Shelton line, for the period February 15 to March 13, a period of 27 days, it appears that 2,011 passengers have been hauled from Anacortes to Oak Harbor, and 2,586 passengers from Oak Harbor to Anacortes."

In January, 1943, Shelton was making but one round trip per day between Anacortes and Oak Harbor. The order of October 11, 1943, which it is charged with willfully disobeying, required it to make six round trips per day. It ascribes its failure to make a portion of the trips in December to breakdowns and to the fact that it was unable to procure competent drivers or competent mechanics to make immediate repairs and keep its busses in good running order. As to the late trips, it introduced evidence from which the department found:

"It appears that during the month of December when most of the irregular operation was alleged to have taken place, that the road between Oak Harbor and Anacortes over which respondent operated, was torn because a water pipe was being installed. The width of the highway was cut down by piles of earth and the shoulders of the road

were soft. It was not wide enough for traffic. This factor, together with unusual mechanical difficulties, and because of the fact that December was a month of heavy mail deliveries and the bus was delayed because the postmaster at Anacortes did not have the mail prepared on time, resulted in some late schedules."

A large part of appellants' brief is devoted to the legal dictionary and case definitions of the word "willful," but we think it unnecessary to discuss them, in view of the explicit findings of the department:

"We find from the evidence that during the month of December and the early part of January, the time schedules were not strictly adhered to. *The evidence indicates strongly that causes beyond the control of respondent were responsible for failure to strictly maintain time schedules.*" (Italics ours.)

The department goes on to say:

"We find, however, that since February 1, 1944, the time schedules of respondent have been strictly maintained and service has been rendered in accordance with said time schedule. With respect to the allegation of the complaint that respondent has failed to provide waiting room or terminal facilities either at Oak Harbor or Anacortes, we find that said terminal facilities have been established and maintained by respondent at Oak Harbor and respondent has, during most of the period of operation from the time of the department's order requiring the establishment of said terminal facilities, maintained a station at Anacortes, . . . It appears and we find that respondent has made every effort to provide adequate and dependable service and has succeeded for the period since February 1, 1944 to the date of this proceeding. We further find that emergency bus passenger service of the Anacortes-Mt. Vernon Stage Company is not required in the interests of the public."

■ There is substantial evidence in this record which, if believed, would support a finding that substantially all failures of Shelton to more promptly carry out the order of October 11, 1943, were caused by conditions beyond its control, and that it was being complied with at and prior to the date of the hearing. The department seems to have

so concluded, and we can find no basis upon which the superior court of Thurston county would have been warranted in setting the findings upon which that conclusion is based aside.

It is said, in the second question stated by appellants, that the respondent, Shelton, produced "vague evidence" that the service had been improved subsequent to the filing of the complaint. This statement is wholly unwarranted. We shall not prolong this opinion by attempting to detail this evidence. We have found that it was direct and positive, and much of it was given by witnesses called by appellants themselves for the purpose of establishing the unsatisfactory character of the service during the month of December.

■ The final question raised by the appellants involves a matter of procedure:

"Fourth: Can the costs of preparing transcript of testimony at Departmental hearing be assessed as costs in subsequent court action?
"The answer of the trial court was in the affirmative."

The appellants' briefs were prepared before we passed upon that identical question in the case of *Taylor-Edwards Warehouse & Transfer Co. v. Department of Public Service,* 22 Wn. (2d) 565, 157 P. (2d) 309. We said, in that case:

"The statute, Rem. Rev. Stat. (Sup.), § 10428 [P. C. § 5613] provides:
" 'The reasonable cost of preparing the transcript of testimony taken before the department shall be assessable as part of the statutory court costs . . . '
"Appellant urges that costs should not be allowed for the preparation of the transcript of the testimony, because it had been prepared by the department for its own convenience before it rendered its decision; consequently, no additional expense was incurred when the writ of review was sued out. No such limitation on the department's right to recover the cost of the transcript can be discerned in the statute."

■ However, a contention is raised in this case that seems not to have been raised in the *Taylor-Edwards* case. It is said that no notice is given, in the title of the statute

in which the cost provision is found, that it contains any provision with regard to costs, and, therefore, the constitutional provision providing that no bill shall embrace more than one subject, and that shall be expressed in the title, is violated, and the provision regarding costs is, therefore, void. However, since the general purpose of the act, as shown in its title, was to amend a general act relating to public service companies and provide for additional supervision and regulation thereof, we cannot say that the matter of costs incurred in reviewing the regulatory orders therein provided for was not germane to the matter, and a wholly separate subject.

The judgment and decree appealed from is affirmed.

BEALS, C. J., BLAKE, SIMPSON, and MALLERY, JJ., concur.